1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES  DISTRICT COURT

## Northern District of California

San Francisco Division

JAMES ELLIS JOHNSON,

                   Plaintiff,

   v.

UNITED STATES,

                 Defendant.

_____/

No. C 10-00647 LB

**ORDER (1) GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND (2)
DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

[Re: ECF Nos. 103, 116]

## I.  INTRODUCTION

    Plaintiff James Johnson, proceeding *pro se*, brought this medical malpractice action against
Defendant United States under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-80.
Complaint, ECF No. 1.[1]  Defendant moved for summary judgment.  Defendant's Motion, ECF No.
103.  Mr. Johnson opposed Defendant's motion and moved for summary judgment as well.
Plaintiff's Declaration, Ex. 8-Q ("Plaintiff's Opposition and Motion"), ECF No. 116 at 209-65.
Upon review of the papers submitted, consideration of the admissible evidence and applicable legal
authority, and the parties' arguments at the hearing on March 15, 2012, the court GRANTS
Defendant's motion and DENIES Mr. Johnson's motion.

///

///

---

     [1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronic page
number at the top of the document, not the pages at the bottom.

**II.  FACTS**

A.  Uncontested Facts[2]

Mr. Johnson served in the United States Army from May 1, 1984 to May 15, 1992.  Walker Declaration, Ex. A ("Johnson Depo."), ECF No. 104-1 at 8.  He attained the rank of sergeant before taking a medical discharge for various service-related injuries.  *Id*. at 8-9, 11-12.  As a result of these injuries, he was rated as disabled by Veteran's Administration ("VA").  *Id*. at 13.  He has not worked since his discharge, and the VA and Social Security Administration provide his income.  *Id*. According to his complaint, Mr. Johnson's service-related injuries included ones to his back, the condition of which "deteriorated to the point that he required back surgery in December 2005." Complaint, ECF No. 1 at 2,  ¶ 7.

1.  Mr. Johnson's Admission to the San Francisco VA Medical Center on December 19, 2005

According to his medical records, on December 18, 2005, Mr. Johnson was admitted to the San Francisco VA Medical Center ("SF VA Medical Center"), and on the morning of December 19, 2005, Dr. Paul Larson, Chief of Neurosurgery at the SF VA Medical, performed an "uncomplicated L4-5 decompression bilaterally with foraminotomy" on Mr. Johnson.  Larson Declaration, ECF No. 105 at 2, ¶ 4; *see* Chou Declaration, ECF No. 106 at 3, ¶ (5)(a); Chou Declaration, Ex. A ("Johnson Medical Records"), ECF No. 106 at 105, 142; *accord* Plaintiff's Opposition and Motion, ECF No. 116 at 213.[3]  A foraminotomy is a medical operation used to relieve pressure on nerves that are

_____

[2] In its motion, Defendant also asked to be excused from submitting a joint statement of undisputed facts.  Defendant's Motion, ECF No. 103 at 7 n.1.  Under the circumstances of this case, the court GRANTS Defendant's request.  This means, however, that the court's statement of undisputed facts is based on its reading of the parties's summary judgment papers and the statements of each party at the March 15, 2012 hearing.

[3] Mr. Johnson possibly disputes the location on his back where the surgery was performed. *See* Plaintiff's Opposition and Motion, ECF No. 116 at 226.  He says that two documents attached to his expert's report – a July 7, 2011 report by Dr. Jason Smith and a February 7, 2008 operation note – suggest that his December 21, 2005 surgery was not only at his L4 and L5 segments but was at his L3 segment as well.  Walker Declaration, Ex. C ("Small Expert Report"), ECF No. 104-3 at 12, 28-30.  Dr. Smith's report, written in 2011, and the operative report, from 2008, simply describe where Mr. Johnson had scar tissue in 2011 and 2008, respectively, and do not purport to say anything about Mr. Johnson's December 21, 2005 surgery.  *See id*.  Mr. Johnson's contention, then, does not raise a genuine issue of material fact with respect to the location of his December 21, 2005 surgery.

being compressed by the intervertebral foramina, the passages through the bones of the vertebrae of the spine that pass nerve bundles to the body from the spinal cord.  Larson Declaration, ECF No. 105 at 2, ¶ 4.  The surgical procedure was "uneventful" and "well-tolerated," and "resulted in no diagnosed complications."  *Id.*; Chou Declaration, ECF No. 106 at 3, ¶ 5(a); Johnson Medical Records, ECF No. 106 at 142.

Mr. Johnson's medical records show that Dr. Rene Sanchez-Meja, the chief resident at the SF VA Medical Center, authored progress notes concerning Mr. Johnson on the mornings of December 20, 2005 and December 21, 2005.  Johnson Medical Records, ECF No. 106 at 127-28, 133.  Dr. Sanchez-Meja's progress note from the morning of December 20, 2005 states in relevant part:

> Doing well
>
> Patient claims he has sensation in the right foot for the first time and has more sensation in the right foot than the left
>
> complains we are not feeding him enough
>
> AF VSS
>
> motor 5/5
> c/d/i
>
> - mobilize
> - d/c [discharge] today or tomorrow

*Id.*[4]  Notably, Dr. Sanchez-Meja's progress note states that Mr. Johnson would be ready to be discharged either that day (December 20, 2005) or the next (December 21, 2005).  *Id.*

Dr. Sanchez-Meja's progress note from the morning of December 21, 2005 states in relevant part:

> continues to say his R foot, toe feel better
>
> he is distraught about a letter he had written to the government for assistance for the New Orleans disaster
>
> AFVSS
> motor 5/5
> c/d/i

---

[4] Mr. Johnson's expert, Dr. Tolbert Small, testified that this note indicates that Dr. Sanchez-Meja found Mr. Johnson's muscles to be of very good strength – rating at a 5 on a scale of 5.  Walker Declaration, Ex. D ("Small Depo."), ECF No. 104-4 at 19.

C 10-00647 LB

a/p:
- mobile, pt/ot
- social work consult
- dispo

Johnson Medical Records, ECF No. 106 at 127-28.

While the parties dispute whether Mr. Johnson was *examined* by Dr. Sanchez-Meja (as opposed to simply being written about by him), they both agree that Mr. Johnson was examined by Matthew Zibilich, a physical therapist, and seen by Aliza Benditsky, a social worker, on December 21, 2005, before he was discharged.  Larson Declaration, ECF No. 105 at 2, ¶5; Chou Declaration, ECF No. 106 at 3, ¶ 5(b)-(c); Johnson Medical Records, ECF No. 106 at 118-22, 127-28; *see also* Complaint, ECF No. 1 at 2, ¶ 7 (On December 21, 2005, "the physical therapist came to Johnson's bed, took Johnson to the stairwell, asked Johnson if he could walk up a flight of stairs."); *id.* ("In walked a social worker, and Johnson made his protest to her.").  Mr. Zibilich observed Mr. Johnson's ability to climb up and down a flight of stairs, and noted that he did "not anticipate [patient] having any problem with 4 flights."  Chou Declaration, ECF No. 106 at 3, ¶ 5(c); Johnson Medical Records, ECF No. 106 at 121-22.[5]  He also noted that "[Patient's] goal is to stay in hospital until December 28th until friends arrive in town.  It is unclear where [patient] received the information that a 10 day hospital stay would be required for this procedure."  Chou Declaration, ECF No. 106 at 3, ¶ 5(c); Johnson Medical Records, ECF No. 106 at 121-22.  Mr. Zibilich nevertheless concluded that "[Patient] has no further PT [physical therapy] needs, and is safe to return home from a PT perspective."  Chou Declaration, ECF No. 106 at 3, ¶ 5(c); Johnson Medical Records, ECF No. 106 at 121-22.  After visiting with Mr. Zibilich, Mr. Johnson's reluctance to be discharged was communicated to Dr. Sanchez-Meja, and Ms. Benditsky was asked to visit Mr. Johnson to discuss the situation. Chou Declaration, ECF No. 106 at 3, ¶ 5(d); Johnson Medical Records, ECF No. 106

---

[5] In a single paragraph that it was attached to his opposition and motion, Mr. Johnson seems to suggest that Mr. Zibilich did not conduct an examination of him.  Plaintiff's Opposition and Motion, ECF No. 116 at 242.  But in the same paragraph, Mr. Johnson describes how Mr. Zibilich visited him and observed him walk up and down a flight of stairs, which is how Mr. Zibilich described the examination.  *See id.*  Moreover, Mr. Johnson stated at oral argument that Mr. Zibilich did examine him briefly.  In light of these representations, the court does not believe that Mr. Johnson has raised any genuine issue of material fact regarding Mr. Zibilich's examination.

UNITED STATES DISTRICT COURT
For the Northern District of California

at 125.  Noting that he did not have a skilled care need, Ms. Benditsky offered to assist Mr. Johnson find other accommodations such as Hoptel care or a shelter bed.  Chou Declaration, ECF No. 106 at 3-4, ¶ 5(e); Johnson Medical Records, ECF No. 106 at 119.[6]  Mr. Johnson "declined all suggestions" for assistance, and indicated that he would take matters into his own hands and call "the patient representative, the White House, Congress and the [n]ewspaper to report his displeasure."  Larson Declaration, ECF No. 105 at 2, ¶ 5; Chou Declaration, ECF No. 106 at 3-4, ¶ 5(e); Johnson Medical Records, ECF No. 106 at 119.

Thereafter, at 4:50 p.m. on the afternoon of December 21, 2005, despite his reluctance, Mr. Johnson was discharged and escorted from the hospital with his medications and discharge instructions.  Larson Declaration, ECF No. 105 at 2, ¶¶ 4-5; Chou Declaration, ECF No. 106 at 4, ¶ 5(f); Johnson Medical Records, ECF No. 106 at 118.  He was reminded of his appointment scheduled for December 29, 2005 to have his sutures removed.  Chou Declaration, ECF No. 106 at 4, ¶ 5(f); Johnson Medical Records, ECF No. 106 at 118.

2.  Mr. Johnson's Re-Admission to the San Francisco VA Medical Center on December 22, 2005

On the morning of December 22, 2005, Mr. Johnson returned to the SF VA Medical Center emergency room, complaining of persistent pain and expressing fear that he was unable to manage at home.  Chou Declaration, ECF No. 106 at 4, ¶ 5(g); Johnson Medical Records, ECF No. 106 at 104-05.  The emergency room doctor noted that Mr. Johnson stated that he "had to walk up 4 flights of stairs at home and was able to do so after first taking Vicodin but felt drugged on the medication [and] when it wore off[,] his pain was excruciating."  Chou Declaration, ECF No. 106 at 4, ¶ 5(g); Johnson Medical Records, ECF No. 106 at 105.  He further noted that Mr. Johnson stated that he

---

[6] According to Defendant, to provide easier access to medical care for veterans traveling a distance for care, the SF VA Medical Center provides as an added service, shared overnight accommodations (bed, linens, and shower facility) in Hoptel.  Generally, veterans are eligible if they live more than 50 miles from SF VA Medical Center with a scheduled clinic appointment or procedure at SF VA Medical Center within a day of their Hoptel stay.  A stay in Hoptel is not an inpatient admission and nursing and care-giving assistance are not available.  Lodgers must be able to attend to their own personal care needs and be bale to get back and forth from scheduled appointments and procedures independently.  Escort assistance is not available while in Hoptel.  Defendant's Motion, ECF No. 103 at 8-9 n.2.

1   also "had a significant amount of pain before he was discharged, perhaps even more pain than he is

2   in now."  Chou Declaration, ECF No. 106 at 4, ¶ 5(g); Johnson Medical Records, ECF No. 106 at

3   105.  Finally, the doctor noted, that Mr. Johnson "does not have any new neurological symptoms."

4   Chou Declaration, ECF No. 106 at 4, ¶ 5(g); Johnson Medical Records, ECF No. 106 at 105.  Mr.

5   Johnson was admitted into the hospital for pain control.  Chou Declaration, ECF No. 106 at 4, ¶

6   5(g); Johnson Medical Records, ECF No. 106 at 104-05.  He was discharged home on December 28,

7   2005 with a referral for a home nurse, physical therapy, and a home evaluation.  Chou Declaration,

8   ECF No. 106 at 4, ¶ 5(g); Johnson Medical Records, ECF No. 106 at 37-44.

9       3.  Mr. Johnson's March 20, 2006 Post-Operative Examination

10      Following his discharge on December 28, 2005, Mr. Johnson returned to the SF VA Medical

11  Center on March 20, 2006 for a post-operative examination.  Larson Declaration, ECF No. 105 at 2-

12  3, ¶ 7; Chou Declaration, ECF No. 106 at 5, ¶ 5(h).  Mr. Johnson met with Dr. Larson for one-and-a-

13  half hours to follow-up about his December 19, 2005 back surgery.  Larson Declaration, ECF No.

14  105 at 2-3, ¶ 7; Chou Declaration, ECF No. 106 at 5, ¶ 5(i).  At this meeting, Mr. Johnson apparently

15  was worried that he "un-did something with the surgery because his leg pain came back."  Larson

16  Declaration, ECF No. 105 at 2-3, ¶ 7; Chou Declaration, ECF No. 106 at 5-6, ¶ 5(i).  In response,

17  Dr. Larson explained that "it is not uncommon to have a little pain right after surgery, but with more

18  activity comes more pain. "  Larson Declaration, ECF No. 105 at 2-3, ¶ 7; Chou Declaration, ECF

19  No. 106 at 5-6, ¶ 5(i).  He also explained that "the key thing to determine," though, is whether Mr.

20  Johnson's pain had improved, and Mr. Johnson stated that his pain had improved by 50%.  Larson

21  Declaration, ECF No. 105 at 2-3, ¶ 7; Chou Declaration, ECF No. 106 at 5-6, ¶ 5(i).

22      Dr. Larson also addressed Mr. Johnson's concern about a possible new annular tear at L3-4 that

23  he said was identified in a March 7, 2006 radiology report.  Larson Declaration, ECF No. 105 at 2-3,

24  ¶ 7; Chou Declaration, ECF No. 106 at 5-6, ¶ 5(i).  Dr. Larson explained that he did not see the tear

25  himself, but that, even if it was there, it likely was not causing Mr. Johnson's leg pain, as his pattern

26  of pain was the same as before the surgery.  Larson Declaration, ECF No. 105 at 2-3, ¶ 7; Chou

27  Declaration, ECF No. 106 at 5-6, ¶ 5(i).  Further, Dr. Larson addressed Mr. Johnson's notion that

28  this possible new tear was associated with his "being kicked out of the hospital too soon."  Larson

UNITED STATES DISTRICT COURT
For the Northern District of California

Declaration, ECF No. 105 at 2-3, ¶ 7; Chou Declaration, ECF No. 106 at 5-6, ¶ 5(i).  Dr. Larson

explained to Mr. Johnson that annular tears can happen in a variety of settings and that there would

be no way of determining how and when it happened.  Larson Declaration, ECF No. 105 at 2-3, ¶ 7;

Chou Declaration, ECF No. 106 at 5-6, ¶ 5(i).  Finally, Dr. Larson addressed a "little change" on Mr.

Johnson's MRI by explaining that the only thing they did during surgery was a foraminotomy, and

that Mr. Johnson's foramen was not very tight in the first place, so the central canal (where the

"little change" on the MRI appeared) could appear different depending upon the location of the

sagittal cuts.  Larson Declaration, ECF No. 105 at 2-3, ¶ 7; Chou Declaration, ECF No. 106 at 5-6, ¶

5(i).  In other words, the MRI can look different based upon idiosyncracies in the placement of the

MRI scanner.  Larson Declaration, ECF No. 105 at 2-3, ¶ 7; Chou Declaration, ECF No. 106 at 5-6,

¶ 5(i).  Dr. Larson stated that Mr. Johnson "expressed satisfaction" at the end of their visit.  Larson

Declaration, ECF No. 105 at 2-3, ¶ 7; Chou Declaration, ECF No. 106 at 5-6, ¶ 5(i).

    4.  Mr. Johnson's 2007 Examinations and Care

    Roughly a year later, on March 12, 2007, Mr. Johnson met with Dr. Larson to follow-up about

his previous back surgery and to discuss his incontinence issues.  Larson Declaration, ECF No. 105

at 4, ¶ 8; Chou Declaration, ECF No. 106 at 6-7, ¶ 5(j); Johnson Medical Records, ECF No. 106 at

151-52.  Dr. Larson offered to perform a lumbar decompression surgery to address the incontinence,

with the caveat that Mr. Johnson's bowel function may not improve, especially if the problem is due

primarily to a gastrointestinal problem.  Larson Declaration, ECF No. 105 at 4, ¶ 8; Chou

Declaration, ECF No. 106 at 6-7, ¶ 5(j); Johnson Medical Records, ECF No. 106 at 151-52.  Dr.

Larson also explained that the longer Mr. Johnson waited for the surgery, the less likely it would be

effective.  Larson Declaration, ECF No. 105 at 4, ¶ 8; Chou Declaration, ECF No. 106 at 6-7, ¶ 5(j);

Johnson Medical Records, ECF No. 106 at 151-52.  Mr. Johnson indicated that he understood the

concern, but he wanted to think about it.  Larson Declaration, ECF No. 105 at 4, ¶ 8; Chou

Declaration, ECF No. 106 at 6-7, ¶ 5(j); Johnson Medical Records, ECF No. 106 at 151-52.  Dr.

Larson's progress note from the examination thus concludes: "We will therefore wait to hear from

him."  Larson Declaration, ECF No. 105 at 4, ¶ 8; Chou Declaration, ECF No. 106 at 6-7, ¶ 5(j);

Johnson Medical Records, ECF No. 106 at 151-52.

1   On March 14, 2007, Mr. Johnson spoke with Dr. Milton Hollenberg, a VA cardiologist,

2   regarding his consultation with Dr. Larson two days earlier.  Chou Declaration, ECF No. 106 at 7, ¶

3   5(k); Johnson Medical Records, ECF No. 106 at 153.  Mr. Johnson explained to Dr. Hollenberg that

4   he believed his diet had something to do with his irregular bowel habits, and he admitted to eating

5   spicy and fatty foods.  Chou Declaration, ECF No. 106 at 7, ¶ 5(k); Johnson Medical Records, ECF

6   No. 106 at 153.  They agreed that before proceeding with the spinal surgery, Mr. Johnson should get

7   a full gastrointestinal work-up.  Chou Declaration, ECF No. 106 at 7, ¶ 5(k); Johnson Medical

8   Records, ECF No. 106 at 153.

9   Two days later, on March 16, 2007, Dr. Larson received a phone call from Mr. Johnson.  Larson

10  Declaration, ECF No. 105 at 4, ¶ 9; Chou Declaration, ECF No. 106 at 7-8, ¶ 5(l).  They discussed

11  the issue and agreed to hold off on having back surgery to correct issues with his incontinence until

12  after Mr. Johnson had a full gastrointestinal work-up.  Chou Declaration, ECF No. 106 at 7, ¶ 5(k);

13  Johnson Medical Records, ECF No. 106 at 153.

14  <u>4.  The Instant Action and Motions</u>

15  On February 16, 2010, Mr. Johnson filed the instant action against Defendant for medical

16  malpractice under the Federal Tort Claims Act.  Complaint, ECF No. 1.  Defendant answered on

17  April 18, 2010.  Answer, ECF No. 6.

18  After discovery closed, Defendant filed a motion for summary judgment on January 23, 2012.

19  Defendant's Motion, ECF No. 103.  Mr. Johnson opposed Defendant's motion and moved for

20  summary judgment as well.  Plaintiff's Opposition and Motion, ECF No. 116, Ex. 8-Q.  The court

21  heard oral argument from the parties on March 15, 2012.

22  <u>B.  Contested Facts</u>

23  Upon review of the parties' papers, the court identifies an important disputed factual issue that

24  deserves mentioning.  Defendant contends, based on Mr. Johnson's medical records and the

25  testimony of Drs. Larson and Chou, that Dr. Sanchez-Meja examined Mr. Johnson on the mornings

26  of December 20, 2005 and December 21, 2005.  Defendants puts forth Dr. Sanchez-Meja's two

27  progress notes from those mornings, which Drs. Larson and Chou reviewed, as evidence that Dr.

28  Sanchez-Meja examined Mr. Johnson.  *See* Johnson Medical Records, ECF No. 106 at 127-28, 133.

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Defendant contends that, based on these examinations, Dr. Sanchez-Meja assessed that Mr. Johnson

2    was ready for discharge.  Larson Declaration, ECF No. 105 at 2, ¶ 5; Chou Declaration, ECF No.

3    106 at 3, ¶ (5)(b); Johnson Medical Records, ECF No. 106 at 127-28, 133.

4         While not disputing the existence of the two progress notes, Mr. Johnson nevertheless disputes

5    that they are evidence that Dr. Sanchez-Meja actually examined him on those mornings.  In his

6    complaint, Mr. Johnson alleged that he was not examined by Dr. Sanchez-Meja or any other doctor

7    on December 21, 2005 prior to his discharge.  Complaint, ECF No. 1 at 3, ¶ 11.  Mr. Johnson

8    maintains this position in his opposition and motion: "I am James Ellis Johnson, the Plaintiff, and I

9    dispute and deny under penalty of perjury that [any] exam of any part of my body took place on 21

10   December 2005 by any doctor.  I had no discussion with any doctor on the 20th nor 21st of

11   December about discharge from the hospital."  Plaintiff's Opposition and Motion, ECF No. 116 at

12   227.  And Mr. Johnson further clarified at oral argument that he was not ever examined by Dr.

13   Sanchez-Meja on either December 20, 2005 or December 21, 2005.[7]  Rather, Mr. Johnson posited

14   that Dr. Sanchez-Meja's two progress notes were based on Dr. Sanchez-Meja's conversions with the

15   nurses who had been checking on him during his stay at the hospital.

### III.  LEGAL STANDARD

17   A.  Summary Judgment

18       Summary judgment is proper if the pleadings, the discovery and disclosures on file, and

19   affidavits show that there is no genuine issue as to any material fact and the moving party is entitled

20   to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S.

21   242, 247-48 (1986).  Material facts are those that may affect the outcome of the case.  *See id.* at 248.

22   A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to

23   return a verdict for the non-moving party.  *See id.* at 248-49.

24       The party moving for summary judgment has the initial burden of identifying those portions of

25   the pleadings, discovery and disclosures on file, and affidavits that demonstrate the absence of a

26

27       _____

28        [7] In his deposition, however, Mr. Johnson was more equivocal, as he testified that he did not
     remember being seen by a doctor on December 20, 2005 or December 21, 2005.  Johnson Depo.,
     ECF No. 104-1 at 15.

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  When the

2    nonmoving party has the burden of proof at trial, the moving party need point out only "that there is

3    an absence of evidence to support the nonmoving party's case." *Id.* at 325.  If the moving party

4    meets this initial burden, the non-moving party must go beyond the pleadings and – by its own

5    affidavits or discovery – set forth specific facts showing a genuine issue for trial. *See* Fed. R. Civ. P.

6    56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

7    586-87 (1986).  If the non-moving party does not produce evidence to show a genuine issue of

8    material fact, the moving party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.  "In

9    considering a motion for summary judgment, the court may not weight the evidence or make

10   credibility determinations, and is required to draw all inferences in a light most favorable to the non-

11   moving party." *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

12       Summary judgment is not only proper if Plaintiff fails to produce *any* evidence on an element of

13   his case, but summary judgment is also proper if Plaintiff fails to produce *sufficient* evidence on an

14   element of his case.  The Supreme Court has specifically held that summary judgment is proper

15   against a party who "fails to make a showing sufficient to establish the existence of an element

16   essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*,

17   477 U.S. at 322.  The mere existence of a "scintilla" of evidence in support of the non-moving

18   party's position is not sufficient.  The non-moving party has the burden of establishing sufficient

19   evidence on each element of his case so that the finder of fact could return a verdict for him.

20   *Anderson*, 477 U.S. at 249.  To meet this burden, the nonmoving party must come forward with

21   admissible evidence. Fed. R. Civ. P.56(e).  Conclusory or speculative testimony in affidavits and

22   moving papers is not sufficient to defeat summary judgment. *See Thornhill Publ'g Co. v. GTE*

23   *Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Moreover, the court should "refuse[]to find a 'genuine

24   issue' where the only evidence presented is "uncorroborated and self-serving testimony." *Villarimo*

25   *v. Aloha Island Air, Inc*., 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Kennedy v. Applause, Inc.*, 90

26   F.3d 1477, 1481 (9th Cir. 1996)).

27       B.  The Federal Tort Claims Act and Mr. Johnson's Medical Malpractice Claim

28       The FTCA provides the exclusive remedy for tort suits against the United States of America or

C 10-00647 LB

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

its agencies.  28 U.S.C. § 2679(a).  FTCA actions are governed by the substantive law of the state in which the alleged tort occurred.  28 U.S.C. § 1346(b)(1); *McGraw v. United States of America*, 281 F.3d 997 (9th Cir. 2002).  Accordingly, Mr. Johnson's medical malpractice claim is governed by the substantive law of California, where he alleges the malpractice occurred.

In California, the elements a plaintiff must prove for a negligence action based on medical malpractice are: "(1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence."  *Johnson v. Superior Court*, 143 Cal. App. 4th 297, 305 (2006); *see Hanson v. Grode*, 76 Cal. App. 4th 601, 606 (1999); *Jacoves v. United Merchandising Corp.*, 9 Cal. App. 4th 88, 113-114 (1992); *see also Dotson v. United States*, No. C 08-04291 SI, 2011 WL 1748351, at *3 (N.D. Cal. May 6, 2011); *Churchill v. United States*, No. CV F 09-1846 LJO JLT, 2011 WL 1743652, at *3 (E.D. Cal. May 6, 2011).  Expert testimony is required to establish these elements.  *See Johnson*, 143 Cal. App. 4th at 305 ("Because the standard of care in a medical malpractice case is a matter 'peculiarly within the knowledge of experts,' expert testimony is required to 'prove or disprove that the defendant performed in accordance with the standard of care' unless the negligence is obvious to a layperson."); *Jennings v. Palomar Pomerado Health Sys.*, 114 Cal. App. 4th 1108, 1118 (2004) ("The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based [on] competent expert testimony."); *Barris v. County of Los Angeles*, 20 Cal. 4th 101, 108 n.1 (1999) ("The standard of care in a medical malpractice case requires that medical service providers exercise . . . that degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances.").

Thus, summary judgment in a medical malpractice case is proper where the plaintiff cannot provide expert testimony to prove a duty owed, breach of that duty, or to show that the defendant's alleged negligence was the proximate cause of the plaintiff's alleged injury.  *See Bushling v. Fremont Med. Ctr.*, 117 Cal. App. 4th 493, 510 (2004) (plaintiff's experts failed to establish breach of care and causation); *Hanson*, 76 Cal.App.4th at 607 ("California courts have incorporated the

UNITED STATES DISTRICT COURT
For the Northern District of California

expert evidence requirement into their standard for summary judgment in medical malpractice cases.

When a defendant moves for summary judgment and supports his motion with expert declarations

that his conduct fell within the community standard of care, he is entitled to summary judgment

unless the plaintiff comes forward with conflicting expert evidence."); *Simmons v. West Covina*

*Med. Clinic*, 212 Cal. App.3d 696, 702-703 (1989) (plaintiff could not show that defendant's

physician's alleged negligence was the probable cause of her alleged injury).

## IV. DISCUSSION

A. Defendant's Evidentiary Objections

As an initial matter and for the sake of clarity, the court will address the documents Mr. Johnson

submitted in opposition to Defendant's motion and in support of his own as well as the documents

he submitted in support of his reply. *See* Plaintiff's Declaration, ECF No. 116; Plaintiff's Reply,

ECF No. 127.

First, Mr. Johnson's opposition to Defendant's motion, which doubles as his motion for

summary judgment, was not filed as its own document, separate from his declaration in support of it.

*See* Plaintiff's Declaration, ECF No. 116; Plaintiff's Opposition and Motion, ECF No. 116 at 209-

65. Instead, on February 16, 2012, Mr. Johnson filed a 278-page declaration in opposition to

Defendant's motion and in support of his motion. Plaintiff's Declaration, ECF No. 116. The

declaration attaches 11 exhibits, which Mr. Johnson labeled Q-1 through Q-11. *See id*. at 2-5, 6-

278.[8] The eighth exhibit is his opposition and motion. Plaintiff's Opposition and Motion, ECF No.

---

[8] Exhibit Q-1 is Mr. Johnson's Expert Witness Disclosure (for his expert Dr. Tolbert Small),
which itself contains a number of attached sub-exhibits. *See* Plaintiff's Declaration, ECF No. 116 at
2, 6-70. Exhibit Q-2 is Defendant's Expert Witness Disclosure (for its expert Dr. Chou). *Id*. at 4,
71-102. Exhibit Q-3 is Mr. Johnson's Rebuttal to Defendant's Expert Witness Disclosure. *Id*. at 4, -
103-19. Exhibit Q-4 is Dr. Chou's declaration in support of Defendant's motion and which was
already submitted by Defendant. *Id*. at 4, 120-130; *see* Chou Declaration, ECF No. 106. Exhibit Q-
5 contains excerpts from the transcript of Dr. Small's deposition. Plaintiff's Declaration, ECF No.
116 at 4, 131-77. Exhibit Q-6 is Dr. Larson's declaration in support of Defendant's motion and
which also was already submitted by Defendant. *Id*. at 4, 178-83; *see* Larson Declaration, ECF No.
105. Exhibit Q-7 is Defendant's motion. Plaintiff's Declaration, ECF No. 116 at 4, 184-207; *see*
Defendant's Motion, ECF No. 103. Exhibit Q-8 is another declaration of Mr. Johnson, but this one
contains what appears to be (and what the court will consider to be) Mr. Johnson's opposition and
motion with numerous documents attached to it without any explanation. Plaintiff's Opposition and

1   116 at 209-65.  (The court describes what the documents are only to make the record clearer because

2   the document organization is not apparent from the electronic docket.)

3       Second, some of Mr. Johnson's exhibits are objectionable, at least as evidence (although the

4   court considers them as Mr. Johnson's argument whenever it can).[9]

---

Motion, ECF No. 116 at 4, 208-265; *see id*. at 226-28 (section titled "Argument in Opposition of Facts"), 229-33 (section titled "The Meaning Behind the Law Used").  Exhibit Q-9 contains a portion of Mr. Johnson's medical records, namely, "Operation Report 30000," which appear to relate to a surgical procedure Mr. Johnson underwent on February 7, 2008.  Plaintiff's Declaration, ECF No. 116 at 5, 266-69.  These records were also included as an exhibit to Dr. Small's expert report.  Small Expert Report, ECF No.104-3 at 28-30.  Exhibit Q-10 is a June 2007 letter from a purported employee of the SF VA Medical Center to United States Representative Nancy Pelosi.  Plaintiff's Declaration, ECF No. 116 at 5, 270-72.  And Exhibit Q-11 appears to be a March 9, 2005 medical report by Dr. Jason Smith.  *Id*. at 5, 273-78.

[9] The court notes that it previously issued a Notice Regarding Legal Help Desk, *Handbook for Litigants without a Lawyer*, and Legal Standards for Summary Judgment Motions.  Notice, ECF No. 77; *see Rand v. Rowland*, 154 F.3d 952, 963 (9th Cir. 1998) (en banc) (requiring fair notice for *pro se* parties).  This notice explained in relevant part:

> A motion for summary judgment – if granted – will result in the dismissal of your
> case.  Federal Rule of Civil Procedure 56 tells you what you must do in order to
> oppose a motion for summary judgment.  Generally, summary judgment must be
> granted when there is no genuine issue of material fact.  What that means is that if
> there is no real dispute about any fact that would affect the result of your case, the
> party who asked for summary judgment is entitled to judgment as a matter of law,
> which ends your case.  When a party you are suing makes a motion for summary
> judgment that is properly supported by declarations (or other sworn testimony), you
> cannot just rely on what your complaint says.  Instead, you must set out specific facts
> in declarations, depositions, answers to interrogatories, or authenticated documents,
> as provided in Rule 56(e), that contradict the facts in Defendant's declarations and
> documents and show that there is a genuine issue of material fact for trial.  If you do
> not submit your own evidence in opposition, the court might – if it is appropriate –
> enter summary judgment against you and in favor of the other party.

Notice, ECF No. 77 at 2 (footnote omitted).  The notice also explained in a footnote:

> A declaration is a statement of facts.  The person making the declaration must know
> those facts personally, and they must be facts that can be admitted into evidence.
> That means that they must be facts as opposed to conclusions, argument, opinion, or
> hearsay.  A declaration must be made under penalty of perjury, which means that the
> person making the declaration must sign it and date the declaration after the

1    Defendant objects to the handwritten notes and annotations that appear on Exhibits Q-1 and Q-5,

2    because, assuming they were authored by Mr. Johnson, they are inadmissable because they are

3    hearsay, are unauthenticated, constitute improper opinions of a lay witness, and are outside of Mr.

4    Johnson's personal knowledge.  Defendant's Reply, ECF No. 120 at 2-3.  Defendant is correct, and

5    the court disregards the handwritten notes and annotations on these exhibits.  The handwritten notes

6    and annotations that appear on the exhibits attached to Mr. Johnson's reply also are disregarded, for

7    the same reasons.  *See id*. at 25-142.  However, to the extent that Mr. Johnson's notes and

8    annotations can be seen as argument in support of his opposition and motion, and considering that

9    Mr. Johnson is representing himself, the court will consider the notes and annotations as such (just

10   not as evidence).

11   Defendant also objects to Exhibit Q-3, which is Mr. Johnson's Rebuttal to Defendant's Expert

12   Witness Disclosure.  But this document is not a rebuttal report by an expert; rather, as Defendant

13   points out, it is argumentative one authored by Mr. Johnson constituting improper opinion by a lay

14   witness and which attaches numerous unauthenticated documents containing hearsay.  Defendant's

15   Reply, ECF No. 120 at 2-3.  Defendant's arguments for its exclusion are correct.  Exhibit Q-3 shall

16   be disregarded.  Again, to the extent that these documents can be construed as Mr. Johnson's

17   arguments, the court considers them as such.

18   Defendant also objects to the first nine pages of Plaintiff's opposition and motion and to the

19   numerous exhibits attached to it.  *Id*.  The first nine pages of the opposition and motion contain a

20   declaration of Mr. Johnson that repeats virtually verbatim the allegations from his complaint

21   (although the declaration states that his surgery took place on December 19, 2005, while his

22   complaint alleges that it took place on December 20, 2005).  *See* Plaintiff's Opposition and Motion,

23   ECF No. 116 at 212-20; *compare id*. at 213, ¶ 5 *with* Complaint, ECF No. 1 at 2, ¶ 8.  As Defendant

24   correctly points out, many of these allegations contain legal conclusions of which Mr. Johnson has

25   no personal knowledge and medical conclusions of which he improperly provides opinion.  In short,

26   _____

27   following statement: "I declare under penalty of perjury that the foregoing is true and
     correct. Dated _____. Signed _____."

28   *Id*. at 2 n1.

his allegations are not evidence to be considered for purposes of summary judgment.[10]  Moreover, most of the documents attached to Mr. Johnson's opposition and motion, *see id.* at 244-47, 252-65, also are not evidence because they are unauthenticated and were not relied upon by any expert during their depositions.  *See United States v. Dibble*, 429 U.S. F.2d 598, 602 (9th Cir. 1970) ("A writing is not authenticated simply be attaching it to an affidavit, even if the writing appears on the fact to have originated from some governmental agency . . . .  The foundation is laid for receiving a document in evidence by the testimony of a witness with personal knowledge of the facts who attests to the identity and due execution of the document and, where appropriate, its delivery.").  The court notes that the documents, in any event, are irrelevant to the malpractice claim here (but, again, the court does consider them as argument.)

Defendant also objects to Exhibits Q-10, which appears to be a letter from an employee of the SF VA Medical Center to United States Representative Nancy Pelosi, and Exhibit Q-11, which appears to be a March 9, 2005 report of Dr. Jason Smith, arguing that they are unauthenticated documents containing hearsay.  Defendant's Reply, ECF No. 120 at 2, 4.  The court agrees that there are authentication issues, but it notes that these documents, in any event, would not affect the outcome here

Finally, Defendant objects to Mr. Johnson's expert disclosure because it does not meet all requirements of Federal Rule of Civil Procedure 26.  Defendant's Motion, ECF No. 103 at 15 n.3.  Given, however, that Defendant's counsel included Mr. Johnson's expert disclosure in his declaration in support of Defendant's motion for summary judgment and discusses Dr. Small's report (which is included in Mr. Johnson's expert disclosure) throughout its motion, the court will overlook any procedural deficiencies.

B. Defendant's Summary Judgment Motion

With the evidence settled, the court turns to Defendant's arguments in favor of summary judgment.  In short, Defendant argues that Mr. Johnson failed to present any admissible evidence or expert testimony to prove a duty owed, breach of that duty, or to show that the Defendant's alleged

---

[10] Again, to the extent that these allegations can be considered as argument in support of his opposition and motion, the court will consider them as such (just not as evidence).

1    negligence was the proximate cause of any his alleged injuries.  Each of these alleged injuries are

2    discussed in turn below.

3        1.  Premature Discharge Claim

4        First, Mr. Johnson alleges that Defendant committed medical malpractice by prematurely

5    discharging him without his being examined by a doctor first, and that this resulted in numerous

6    subsequent injuries.  *See* Complaint, ECF No. 1 at 2-4, 7-9, ¶¶ 7, 10, 13, 20, 44-48, 58-61.  He

7    alleges that, as a result of his premature discharge, he: (1) has "four crushed disks in a row in his

8    lower back," which have caused him to fall several times and have required him to undergo

9    subsequent knee, shoulder, and back surgeries; (2) suffered a new annular tear in his back that was

10   identified on a March 7, 2006 MRI report; (3) has lost his ability to have an erection; and (4) has lost

11   control of his bowel movements.  *See id.*

12       As stated above, under California law, Mr. Johnson must show that Defendant had a duty "to use

13   such skill, prudence, and diligence as other members of his profession commonly possess and

14   exercise."  *Johnson*, 143 Cal. App. 4th at 305.  And "[b]ecause the standard of care in a medical

15   malpractice case is a matter 'peculiarly within the knowledge of experts,' expert testimony is

16   required to 'prove or disprove that the defendant performed in accordance with the standard of care'

17   unless the negligence is obvious to a layperson."  *Johnson*, 143 Cal. App. 4th at 305.  Defendant

18   argues that Mr. Johnson fails to establish, through admissible expert testimony or otherwise, the

19   existence of a genuine issue of material fact as to whether Defendant breached the applicable

20   standard of care when discharging Mr. Johnson's from the hospital.

21       At least initially, Mr. Johnson's claim was that under the SF VA Medical Center's policy, he

22   could not have been discharged for at least two days after his surgery.  *See, e.g.*, Complaint, ECF

23   No. 1 at 2-3, ¶¶ 8, 15.  The basis for his claim that there is a policy that requires at least a two-day

24   hospital stay for lumbar surgery appears to be a letter from an employee of the SF VA Medical

25   Center to United States Representative Nancy Pelosi.  *See* Plaintiff's Declaration, ECF No. 116 at

26   270-72 (Exhibit Q-10).  As explained above, that letter was not properly authenticated.  A single

27   unauthenticated letter is not admissible expert testimony that establishes a standard of care.  *See*

28   *Johnson*, 143 Cal. App. 4th at 305.  But assuming that the letter is a business record capable of being

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

authenticated, it does not establish a two-day rule or standard of care. Mr. Johnson's expert, Dr. Small, also appears to agree that there is no standard of care that requires a two-day hospital stay. Small Expert Report, ECF No. 104-3 at 5 ("There are always exceptions to any rule – some patients stay shorter and some patients stay longer than 48 hours."); Small Depo., ECF No. 104-4 at 11 (suggesting that discharging a patient within 1 to 3 days would be within the standard of care). In sum, Mr. Johnson presents no evidence establishing any a standard of care that requires a two-day hospital stay following the type of procedure Mr. Johnson underwent.

In any event, the record shows surgery on the morning of December 19, 2005 and discharge on the afternoon of December 21, 2005. In his declaration at the beginning of his opposition and motion and at the hearing, Mr. Johnson agreed that these were the time parameters of the surgery and discharge. *See* Plaintiff's Opposition and Motion, ECF No. 116 at 213. Mr. Johnson's claim remains that under the circumstances of his treatment, his discharge was premature.

More specifically, Defendant provided expert testimony setting forth the applicable standard of care, and Mr. Johnson argues that this standard of care was not met, either. Defendant's expert, Dr. Chou, who is an Associate Professor of Neurosurgery at the University of California - San Francisco, testified that "[t]he standard of care after single-level lumbar laminectomy is to have the patient discharged either the same day of surgery or the following 1 to 2 days" and that "[t]he standard procedure for discharging the patient after surgery is to have the patient examined by a member of the team from the neurosurgery service." Chou Declaration, ECF No. 106 at 8, ¶¶ 7-8. The member of the neurosurgery team "does not have to be the attending neurosurgeon." *Id*. at 8, ¶ 8. He further testified that "[t]he standard of care is met if the patient is discharged on postoperative on day #1." *Id*. at 8, ¶ 7.

Defendant argues that, under this standard of care, not only has Mr. Johnson failed to provide any expert testimony establishing that Defendant breached it, the admissible expert testimony he did provide establishes that Defendant did *not* breach it. As stated above, Defendant argues that Mr. Johnson was examined by Dr. Sanchez-Meja on December 20, 2005 and that he noted that Mr. Johnson was ready to be discharged either that day (December 20, 2005) or the next (December 21, 2005). Johnson Medical Records, ECF No. 106 at 133. Defendant further argues that Dr. Sanchez-

UNITED STATES DISTRICT COURT
For the Northern District of California

1 Meja examined Mr. Johnson again on December 21, 2005. *Id*. at 127-28. The basis for its assertion

2 are Dr. Sanchez-Meja's progress notes from those mornings. *Id*. at 127-28, 133. In addition, Mr.

3 Johnson was examined by Mr. Zibilich on December 21, 2005 as well, and he similarly found Mr.

4 Johnson ready for discharge. Chou Declaration, ECF No. 106 at 3, ¶5(c); Johnson Medical Records,

5 ECF No. 106 at 121-22. If Mr. Johnson indeed was examined by Dr. Sanchez-Meja, under the

6 applicable standard of care – which can be generally stated as "upon examination by a neurosurgeon

7 after the surgery" – the expert testimony submitted in this case suggests that Defendant met it. *See*

8 Chou Declaration, ECF No. 106 at 9, ¶ 10; Small Depo., ECF No. 104-4 at 20 ("Q. Okay. And so

9 then–so this the examination by a physical therapist and by a doctor, and [objection made] . . . and

10 by a doctor based on these medical records. Based upon those, the two records you just read, was

11 the standard of care met here? A: The standard of care was met based on those records." ); *id*. at 11

12 ("Q. Okay. And in Mr. Johnson's case specifically, was it within the standard of care to release him

13 when he was released in this case? A. Yes, it was.").

14     Mr. Johnson, however, insists, both in his papers and at oral argument, that Dr. Sanchez-Meja's

15 never actually conducted examinations of him on December 20, 2005 and December 21, 2005.

16 Complaint, ECF No. 1 at 3, ¶ 11; Plaintiff's Opposition and Motion, ECF No. 116 at 227.[11] As

17 described above, Mr. Johnson suggests that Dr. Sanchez-Meja's two progress notes reflect his

18 thoughts after talking with nurses and do not reflect his impressions following examinations. In

19 light of Mr. Johnson's denial that he was never examined by a neurosurgeon, the court finds that a

20 genuine issue of material fact exists about whether Defendant breached the applicable standard of

21 care.

22     But even assuming that Mr. Johnson was not examined, Mr. Johnson still failed to put forth

23 evidence that Defendant's breach caused his injuries, which, under California law, he must do with

24 expert testimony. *See Jennings*, 114 Cal. App. 4th at1118 ("The law is well settled that in a personal

25 injury action causation must be proven within a reasonable medical probability based [on]

27/28 [11] But again, in his deposition, Mr. Johnson was more equivocal, as he testified that he did not remember being seen by a doctor on December 20, 2005 or December 21, 2005. Johnson Depo., ECF No. 104-1 at 15.

competent expert testimony.").  For example, Mr. Johnson's belief that his "crushed disks" caused

him to lose control of his right leg and then to fall, resulting in further injury to his knee, shoulder,

and back, is refuted by Dr. Sanchez-Meja's December 20, 2005 progress note, which states that Mr.

Johnson's leg strength was very good – rating at a 5 on a scale of 5 – strength.  *See* Johnson Medical

Records, ECF No. 106 at 133; Small Depo., ECF No. 104-4 at 19.  In addition, Dr. Small's expert

report never concludes that any premature discharge from the hospital caused Mr. Johnson's

injuries.  *See generally* Small Expert Report, ECF No. 104-3.

In another instance, Mr. Johnson alleges that he suffered a new annular tear that was identified in

his March 7, 2006 MRI report, but Dr. Small's report only states that "degenerative changes can be

caused by trauma (e.g., multiple falls)," and it does not even indicate that Mr. Johnson's possible

new annular tear in fact was caused by trauma.  *Id.* at 5.  And even if there was a new injury caused

by trauma, a claim Defendant's expert Dr. Chou refutes, *see* Chou Declaration, ECF No. 106 at 11, ¶

17, Mr. Johnson has provided no admissible expert testimony or evidence to establish that his

discharge was reasonably likely to have caused that injury, as he must.  *Jennings*, 114 Cal. App. 4th

at 1118.  Indeed, Dr. Small could not state with a reasonable degree of medical probability that the

annular tear was caused by trauma.  *See* Small Depo., ECF No. 104-4 at15-16 ("It's one of those

questions where I can't say the fall caused it.").

Nor did Mr. Johnson submit any expert testimony or evidence tying his allegations that he has

lost his ability to have an erection and lost control of his bowel movements to his discharge from the

hospital on December 21, 2005.  Dr. Small did not address these claims at all in his report or in his

deposition testimony.  *See generally* Small Expert Report, ECF No. 104-3; Small Depo, ECF No.

104-4.  Dr. Chou, however, reviewed Mr. Johnson's postoperative MRI reports, determined that

there was "no evidence of severe central stenosis or compression of the nerves," and concluded that

"there is no evidence that his complaints are related to his spine at all."  Chou Declaration, ECF No.

106 at 11-12, ¶ 19.  Dr. Chou also concluded that Mr. Johnson's issues were "not related to his

discharge date or time because the notes in the record clearly document that his neurologic function

in his lower extremities was intact upon discharge and because the postoperative MRI shows no

nerve compression."  *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

1    The court recognizes Mr. Johnson's real medical issues.  But because he did not provide expert

2    testimony or evidence to establish that Defendant's possible breach of the applicable standard of

3    care caused his injuries, or to show that a genuine issue of material facts exists with respect to this

4    element, the court GRANTS Defendant's motion for summary judgment with respect to Mr.

5    Johnson's claims related to his allegedly premature discharge from the hospital.  *See Celotex*, 477

6    U.S. at 322 (summary judgment is proper against a party who "fails to make a showing sufficient to

7    establish the existence of an element essential to that party's case, and on which that party will bear

8    the burden of proof at trial").

9        2.  Failure to Provide Brace Claim

10   Second, Mr. Johnson alleges that Defendant committed medical malpractice by failing to give

11   him a brace or other support for his back upon his discharge.  Complaint, ECF No. 1 at 4, ¶ 21.

12   Defendant argues that Mr. Johnson has failed to establish any standard of care, Defendant's breach

13   of it, or that Defendant's breach caused Mr. Johnson injury.

14   Defendant is correct.  Mr. Johnson did not submit any evidence suggesting that the standard of

15   care is for a patient to receive a brace after lumbar surgery.  Indeed, only Defendant's expert Dr.

16   Chou did so, and he stated that "[t]he standard of care after a lumbar laminectomy is to not wear a

17   brace."  Chou Declaration, ECF No. 106 at 10, ¶ 15.  Contrary to Mr. Johnson's suggestion,

18   "[h]aving a patient wear a brace after a laminectomy is not the standard of care."  *Id.*  Moreover, Mr.

19   Johnson's expert, Dr. Small, who is not a neurosurgeon, testified that he would defer to Dr. Chou's

20   opinion on this matter.  Small Depo., ECF No. 104-4 at 14; *see generally* Small Expert Report, ECF

21   No. 104-3 (report does not address Mr. Johnson's claim that Defendant breached standard of care by

22   not providing him with a brace).

23   Accordingly, the court GRANTS Defendant's motion for summary judgment with respect to Mr.

24   Johnson's claim related to Defendant's failure to provide him with a brace.

25       3.  Failure to Provide Transportation Claim

26   Third, Mr. Johnson alleges that Defendant committed medical malpractice by failing to provide

27   him with transportation by a hospital medical van after his discharge, whereupon he was forced to

28   take a taxi or public transportation, which resulted in his December 19, 2005 surgery being

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   "undone."  Complaint, ECF No. 1 at 4, 6, ¶¶ 22, 37-40.  Defendant argues that Mr. Johnson has

2   failed to establish any standard of care, Defendant's breach of it, or that Defendant's breach caused

3   Mr. Johnson injury.

4        Mr. Johnson presented no admissible expert testimony or evidence to establish that Defendant

5   had a duty to provide him with transportation after his discharge on December 21, 2005.  It is true

6   that Dr. Small testified that transportation is commonly provided to patients after having surgery, but

7   Dr. Small's testimony is hardly unequivocal on this point.  *See* Small Depo., ECF No. 104-4 at 17.

8   It is also true that Dr. Small stated in his report that Mr. Johnson received a letter notifying him that

9   patients undergoing outpatient surgery must have a responsible driver to take the patient home and

10  that this driver may not be a taxi driver, *see* Small Expert Report, ECF No. 104-3 at 5, but this letter,

11  which is attached to his report, is from April 27, 2010 and does not relate to Mr. Johnson's

12  December 19, 2005 surgery at all, nor is it expert testimony or evidence purporting to set forth a

13  standard of care, *see id.* at 58.

14       Even assuming that Mr. Johnson had provided evidence establishing this standard of care,

15  though, Mr. Johnson presented no admissible expert testimony or evidence to establish that his

16  having to ride in a taxi or on public transportation "undid" his December 19, 2005 surgery.  Dr.

17  Small was not able to make the required causal connection.  Small Depo., ECF No. 104-4 at 17 ("Q:

18  With respect to those – Mr. Johnson's back surgery that he had done in December of 2005, do you

19  have any objective evidence that riding those buses undid his surgery?  A.  No, I don't.").  And

20  Defendant's expert Dr. Chou testified that "there is no data to show that riding public transportation

21  with fiberglass seats can 'undo' a laminectomy," that "[t]here is no data to show that riding public

22  transportation with fiberglass seats causes damage to one's spinal column," and that "[i]n my years

23  of national and international conferences, reading medical journals, and conversations with my

24  professional colleagues, I have never heard of any patient having any spinal injury from riding

25  public transportation with fiberglass seats."  Chou Declaration, ECF No. 106 at 10-11, ¶ 16.  In

26  addition, Dr. Chou testified that Mr. Johnson's March 7, 2006 postoperative MRI report notes that

27  existence of an "Interval L4-5 laminotomy with postoperative changes," thus demonstrating that

28  postoperative and post-bus rides did not "undo" Mr. Johnson's surgery.  *Id.*

UNITED STATES DISTRICT COURT
For the Northern District of California

1   Accordingly, the court GRANTS Defendant's motion for summary judgment with respect to Mr.

2   Johnson's claim related to Defendant's failure to provide him with postoperative transportation.

3       4.   Failure to Address Potential New Annular Tear Claim

4       Fourth, Mr. Johnson alleges that Defendant committed medical malpractice by downplaying the

5   severity of a possible new annular tear in his back that appeared in the March 7, 2006 MRI report.

6   Complaint, ECF No. 1 at 6, ¶¶ 42-43.  The official report of Mr. Johnson's March 7, 2006 MRI

7   states: "Overall, this is similar in appearance to the preoperative scan.  New annular tear at L3-4."

8   Chou Declaration, ECF No. 106 at 5, 5(h); Johnson Medical Records, ECF No. 106 at 150.  But as

9   Dr. Chou testified, "[a]n annular tear is a degenerative condition that happens as we age.  It is not

10  reflective of an injury, but rather, it is reflective of normal degenerative conditions of the spine.

11  This annular tear does not represent a new injury."  Chou Declaration, ECF No. 106 at 11, ¶ 17.

12  Defendant argues that Mr. Johnson has failed to establish any standard of care, Defendant's breach

13  of it, or that Defendant's breach caused Mr. Johnson injury.

14      Mr. Johnson alleges that Dr. Larson dismissed the possible new annular tear on his back as

15  "being nothing," Docket Entry No. 1, Complaint, ¶ 43, but Mr. Johnson does not provide any expert

16  testimony or evidence establishing the standard of care.  But even if he had, the record shows that

17  Dr. Larson discussed the MRI report and Mr. Johnson's concerns about it.  Larson Declaration, ECF

18  No. 105 at 2-4, ¶ 7; Chou Declaration, ECF No. 106 at 11, ¶ 18.  And nowhere did Dr. Small testify

19  that Dr. Larson's discussion with Mr. Johnson failed to satisfy any standard of care.

20      Accordingly, the court GRANTS Defendant's motion for summary judgment with respect to Mr.

21  Johnson's claim that Dr. Larson dismissed a potential new annular tear as nothing.

22      5.   Failure to Perform Emergency Surgery in 2007 Claim

23      Fifth, Mr. Johnson alleges that Defendant committed medical malpractice by failing to perform

24  needed emergency surgery on his back and shoulder in 2007.  Complaint, ECF No. 1 at 7-8, ¶¶ 45-

25  46, 50-57.  Defendant argues that Mr. Johnson has failed to establish any standard of care,

26  Defendant's breach of it, or that Defendant's breach caused Mr. Johnson injury.

27      Mr. Johnson provided no admissible expert testimony or evidence setting forth the applicable

28  standard of care, but even if he did, he also has not provided any admissible expert testimony or

UNITED STATES DISTRICT COURT
For the Northern District of California

1   evidence establishing Defendant's breach of it.  As described above, Mr. Johnson met with Dr.

2   Larson on March 12, 2007 to follow-up about his back surgery and to discuss his incontinence

3   issues.  Larson Declaration, ECF No. 105 at 4, ¶ 8; Chou Declaration, ECF No. 106 at 6-7, ¶ 5(j);

4   Johnson Medical Records, ECF No. 106 at 151-52.  Dr. Larson offered to perform a lumbar

5   decompression surgery to address the incontinence (although he noted that the surgery might not be

6   successful if the problem was a gastrointestinal one), and Mr. Johnson stated that he wanted to think

7   about it.  Larson Declaration, ECF No. 105 at 4, ¶ 8; Chou Declaration, ECF No. 106 at 6-7, ¶ 5(j);

8   Johnson Medical Records, ECF No. 106 at 151-52.  Dr. Larson's progress note thus concludes: "We

9   will therefore wait to hear from him."  Larson Declaration, ECF No. 105 at 4, ¶ 8; Chou Declaration,

10  ECF No. 106 at 6-7, ¶ 5(j); Johnson Medical Records, ECF No. 106 at 151-52.  Mr. Johnson then

11  spoke with Dr. Milton Hollenberg, a VA cardiologist, on March 14, 2007, and afterward they agreed

12  that before proceeding with the spinal surgery, Mr. Johnson should get a full gastrointestinal work-

13  up.  Chou Declaration, ECF No. 106 at 7, ¶ 5(k); Johnson Medical Records, ECF No. 106 at 153.

14  Two days later, on March 16, 2007, Mr. Johnson called Dr. Larson, and they agreed to hold off on

15  having back surgery to correct issues with his incontinence until after Mr. Johnson had a full

16  gastrointestinal work-up.  Larson Declaration, ECF No. 105 at 4-5, ¶ 9; Chou Declaration, ECF No.

17  106 at 7, ¶ 5(l), (k); Johnson Medical Records, ECF No. 106 at 153.

18      In short, as the record shows, Mr. Johnson discussed having surgery with two doctors, and they

19  all agreed to wait to have further surgery.  Mr. Johnson provided no evidence indicating otherwise,

20  and Dr. Small's report and testimony is silent on this issue.  Accordingly, the court GRANTS

21  Defendant's motion for summary judgment with respect to Mr. Johnson's claim that Defendant

22  prevented him from undergoing emergency surgery.

23  C.  Mr. Johnson's Summary Judgment Motion

24      In light of the court granting Defendant's summary judgment motion in its entirety, Mr.

25  Johnson's cross-motion for summary judgment necessarily must be DENIED.

26                                    **V.  CONCLUSION**

27      Based on the foregoing, the court GRANTS Defendant's motion for summary judgment in its

28  entirety and DENIES Mr. Johnson's motion for summary judgment in its entirety.

1    This disposes of ECF Nos. 103, 116.

2    **IT IS SO ORDERED.**

3    Dated: March 30, 2012



4    _____
     LAUREL BEELER
5    United States Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
For the Northern District of California

C 10-00647 LB